UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JOHN L. LEWIS, et al.,                    :

                        Plaintiffs,       :          REPORT AND
                                          :          RECOMMENDATION
            - against -                   :
                                          :          05 Civ. 9243 (GBD) (RLE)
RAYMOND CUNNINGHAM, et al.,               :

                        Defendants.       :
_____

To the HONORABLE GEORGE B. DANIELS, U.S.D.J.:

## I.  INTRODUCTION

*Pro se* plaintiffs, John L. Lewis ("Lewis") and Jimmy D. Smith ("Smith"), filed this

lawsuit against several employees of Woodbourne Correctional Facility ("Woodbourne") –

Raymond Cunningham, the Superintendent; Steven P. Lowry, the Deputy Superintendent of

Security; Peter Chiavaro, the Deputy Superintendent of Administrative Services; Frank

Lancelotti, a clinical physician; Mervat R. Makram, a clinical physician; and Denise F. Boyd, the

Nurse Administrator – and George E. Pataki, former governor of New York; Glenn Goord,

Commissioner, New York State Department of Correctional Services ("DOCS"); and Dr. Lester

Wright, Chief Medical Officer, DOCS (collectively, "defendants"), raising claims pursuant to 42

U.S.C. § 1983.  Lewis and Smith allege that defendants have demonstrated deliberate

indifference to their medical needs in violation of the Eighth Amendment.  According to their

second amended complaint ("complaint"), both Lewis and Smith suffered heart attacks while in

prison and have been diagnosed with systolic heart failure.  Second Amended Complaint

("Compl.") ¶¶ 3, 14.  Lewis and Smith allege that various aspects of their prison conditions do

not comport with their prescribed medical treatment and/or aggravate their illnesses.  ***See, e.g.,***

**Id**. ¶¶ 25-26, 41, 49, 54, 59, 81, 84, 87.  Lewis also alleges that he was subjected to retaliation for filing grievances, as well as utilizing other methods of complaint, about prison conditions.  ***See, e.g.,* Id**. ¶¶ 46, 53, 57, 60, 61.  Lewis and Smith are seeking injunctive relief and damages.  **Id**. at 37.  In addition, Lewis and Smith ask that this Court certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure for all prisoners with chronic heart conditions.  **Id**. ¶¶ 138-146.

On July 31, 2006, defendants moved to dismiss the complaint, pursuant to Rules 12(b)(1) and 12(b)(6), on the grounds that: (1) defendants are sued in their official capacity and, therefore, are shielded from liability by the Eleventh Amendment; (2) Lewis and Smith have failed to exhaust their administrative remedies; (3) Lewis and Smith fail to state a claim against defendants for deliberate indifference to a serious medical need; (4) Lewis and Smith fail to allege any personal involvement in the alleged constitutional violation by Pataki, Goord, Wright, or Boyd; (5) Lewis and Smith's claims of retaliation are wholly conclusory and do not allege an adverse action; and (6) defendants are entitled to qualified immunity.  Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint ("Def. Mem."), at i-ii.  In addition, defendants argue that, even if the motion to dismiss is not granted, class certification should not be granted because (1) a *pro se* plaintiff cannot represent a class; (2) Lewis and Smith have not properly moved for class certification; and (3) the alleged injuries are not sufficiently similar to form a class.  **Id**. at ii.  The case was referred to the undersigned on August 21, 2006.  For the reasons set forth below, I recommend that defendants' motion to dismiss be **GRANTED** as to: (1) all claims for damages against defendants in their official capacity, (2) all claims by Smith, (3) all retaliation claims, (4) any claims for injunctive relief by Lewis, and (5) any claims for monetary relief against Pataki, Goord, Lancellotti, Makram, and Boyd; and **DENIED** as to

2

Lewis's claim of deliberate indifference to a serious medical need against Cunningham, Lowry, Wright and Chiavaro, in their individual capacity.

## II.  BACKGROUND

At the time of the filing of the complaint, Lewis and Smith were both incarcerated at Woodbourne.  Compl. ¶ 3.

### A.  Factual Allegations by Plaintiff Lewis

Lewis was serving a sentence of twenty years to life for second degree murder, but has since been released from prison.  **Id**. ¶ 3; Letter from Efthimios Parasidis, January 9, 2007. Lewis suffered two heart attacks, on March 20, 2001 and one week later, and now suffers from systolic dysfunction, or systolic heart failure.  **Id**. ¶¶ 3, 14.  Lewis received angioplasty treatment and a stent was inserted into his arteries to increase blood flow to the heart.  **Id**. ¶ 16.  He was also prescribed a number of medications for his condition, and instructed to follow a behavioral regimen.  Id. ¶ 18.  Cardiologists recommended that Lewis exercise moderately through walking; stop any activity that caused chest pain, discomfort, tightness in the chest, or shortness of breath; lose weight; and avoid heat, humidity, physical stress, mental stress, and overexertion.  **Id**. ¶¶ 18, 31-32.

#### 1.  Medical Trips and Transfer Policy

When Lewis suffered the heart attacks, he was incarcerated at Mid-Orange Correctional Facility.  **Id**. ¶ 28.  On March 17, 2005, he was transferred to Down State Correctional Facility. **Id**. ¶ 36.  On April 1, Lewis was transferred again, this time to Woodbourne.  **Id**. ¶¶ 36-37. During the transfer to Woodbourne, he was kept in a small, crowded detainment pen for approximately ten hours.  **Id**.  There were no windows in the detainment pen and he began

3

experiencing shortness of breath and chest pain.  **Id**.  The correctional officers transporting Lewis mocked him, asking him not to die because they did not want to do additional paperwork.  **Id**. After arriving at Woodbourne, Lewis was ill for two weeks, experiencing overall weakness and shortness of breath.  **Id**. ¶ 38.

On May 18, 2005, Lewis was transported to Albany Medical Center for a follow-up visit to treat a pseudoaneurysm.  **Id**. ¶ 41.  He was awakened at 3:30 a.m., and placed in a van at approximately 5:00 a.m.  **Id**.  He was chained, shackled, cuffed and "black-boxed,"[1] during the trip to and from the facility and while awaiting the appointment, for a total of fifteen hours.  **Id**. ¶¶ 41-42.  Lewis's appointment was scheduled for 10:00 a.m. and lasted forty-five minutes, but he was detained at the facility for approximately five hours because of other prisoners' appointments.  **Id**. ¶ 41.  Because of Lewis's heart condition, fluid built up in his hands and feet, which caused the handcuffs to restrict his circulation.  **Id**.  The correctional officers present enlarged Lewis's handcuffs to the extent possible.  **Id**.  They also recommended that Lewis speak to the medical staff at Woodbourne about getting a larger pair of cuffs and shackles.  **Id**.  After dropping off other prisoners at their respective facilities, Lewis arrived back at Woodbourne at 7:45 p.m.  **Id**. ¶ 42.  He was ill, and was not able to leave his bed for two days.  **Id**. ¶¶ 42-43.  He informed the receiving nurse at Woodbourne that he could not handle medical trips of this nature because of his heart condition.  **Id**. ¶¶ 42-43.

On May 26, 2005, Lewis met with Dr. Lancellotti, and told him about the difficulties he was experiencing when taken to medical appointments.  **Id**. ¶ 44.  On June 8, Dr. Makram

---

[1]Lewis does not explain this term in his complaint.

ordered a "no hubs trip" permit, which allowed Lewis to avoid traveling on buses that made multiple stops.  **Id**. ¶ 47.  On June 9, Lewis was transported to a medical appointment for leg and foot problems, but the heat and humidity caused him to experience symptoms of shortness of breath, chest pain, and swelling in his hands and feet.  **Id**. ¶ 45.  Lewis met with Dr. Lancellotti again, and told him that he could not stand the summer medical appointments because of the effect the heat and humidity had on his heart condition.  **Id**. ¶ 46.  Dr. Lancellotti said he "was sorry prison was hard" on Lewis, and that, if he did not stop complaining, he would "see about having him transferred to Attica or Clinton (maximum security prisons) where it would not be so hot."  **Id**.

On June 20, 2005, Lewis asked the civilian supervisor of the Inmate Grievance Resolution Committee ("IGRC") if the medical trip procedures and transfer policy were grievable issues within the IGRC.  **Id**. ¶ 117.  The civilian supervisor told Lewis that IGRC was not the proper forum to raise those issues because they were DOCS policy issues.  **Id**.  The civilian supervisor recommended that Lewis bring his complaints to the attention of the DOCS Chief Medical Officer, Dr. Wright.  **Id**.  The civilian supervisor also told Lewis that other prisoners had attempted to bring grievances about these issues to IGRC in the past, and that the DOCS Central Office Review Committee ("CORC") had determined that IGRC was not the proper forum.  **Id**.  Lewis also asked Superintendent Cunningham whether the medical trip system was an issue he could file an IGRC grievance about.  **Id**. ¶ 118.  Cunningham said that the proper method of addressing the issue was to make a written application to Dr. Wright.  **Id**.  On October 3, 2005, Lewis sent a letter to the Department of Health, Office of Professional Medical Conduct, complaining about the medical trips and transfer policy, and forwarded a copy

to Dr. Wright.  **Id**. ¶ 119.  On October 18, 2005, Pedro Diaz wrote to Lewis, on Dr. Wright's

behalf, and advised Lewis to raise his concerns about medical trips and transfers with the

Woodbourne facility physician, Dr. Lancellotti.  **Id**. ¶ 120.

### 2. "Flats" Permit

On April 2, 2005, Drs. Lancellotti and Makram ordered a "flats" permit for Lewis, which

was intended to secure him a housing assignment with minimal stair climbing **Id**. ¶¶ 47-48.  At

the time of the complaint, Lewis was housed in Block B-1, a designated housing block for

prisoners with medical needs.  **Id**. ¶¶ 53-54.  Each housing block treats their medical prisoners

differently, and Lewis's medical needs were not recognized despite the permit.  **Id**.  He was not

given a housing assignment with minimal stair climbing.  **Id**. ¶¶ 48, 54.  In addition, the officers

assigned to Block B-1 often did not remain on the unit, which left Lewis without any means of

getting help if he had a medical need.  **Id**. ¶ 54.  On August 16, 2005, Lewis filed a grievance

("August 16 grievance"), detailing the problems with Block B-1, as well as other issues.  **Id**. ¶

53.  After filing the grievance, correction officers threatened Lewis on four occasions, saying that

they would set him up and no one would come help him.  **Id**.  Lewis was also referred to as "the

fat rat snitch bastard" by prison security staff on at least one occasion.  **Id**. ¶ 98.  On September

7, Lewis's grievance was addressed in a hearing, and it was recommended that he be transferred

to a unit better equipped to handle his medical needs.  **Id**. ¶ 101.  Cunningham rejected the

resolution, finding that the housing unit Lewis was placed in was sufficient for his medical needs

and that no retaliation had occurred.  **Id**. ¶ 103.  Lewis appealed Cunningham's ruling to CORC.

**Id**. ¶ 104.  CORC accepted Cunningham's ruling, but advised Lewis that he had raised an issue

in his appeal that had not previously been raised - that he needed to be housed in a unit with

constant surveillance because of the potential for a future heart attack. **Id**. ¶¶ 106-07.  In a grievance filed on October 18, 2005 ("October 18 grievance"), Lewis raised this issue. **Id**. ¶ 107. On October 28, he was told that the recommendation was a transfer to a 24-hour manned unit, and that he would be moved within a day or two if he agreed to this resolution of the grievance. **Id**. ¶ 108.  Lewis signed the grievance resolution on the condition that he be moved. **Id**.  He was not moved until February 15, 2006, and only after he informed the Woodbourne Security Office that he was aware of the permit issued on October 25, 2005, requiring such a transfer. **Id**. ¶ 108-09.

### 3.  Move to Different Cell

Lewis was also forced to switch cells. **Id**. ¶ 49.  On August 4, 2004, he was instructed to pack his belongings so that he could be moved to a different cell. **Id**. ¶ 51.  As he was packing, he began having chest pains, and was taken to an outside hospital. **Id**.  At the hospital, he was diagnosed as having suffered effects from the heat and, possibly, an anxiety attack. **Id**.  Lewis was kept in the hospital for five days, and the treating physicians advised him to avoid heat and heavy exertion during the summer months. **Id**.  When he returned to Woodbourne, he learned that another prisoner with the same medical permit had been assigned to his previous cell. **Id**. ¶ 52.

### 4.  Other Permits

On May 26, 2005, Dr. Lancellotti requested a permit for Lewis to have a twenty inch box fan. **Id**. at 44.  On June 9, a "no yard" permit was ordered by Drs. Lancellotti and Makram. **Id**. ¶ 47.  This permit allowed Lewis to remain in his cell during the summer months, instead of being required to go outside. **Id**.  However, part of his prescribed behavior regimen was to get

moderate exercise, and he was not able to exercise outside during the summer months because neither of the two yards at Woodbourne were appropriate.  **Id**. ¶ 59.  One yard was located up a steep hill, which medical personnel had advised him not to climb, and the other had no shade. **Id**.

### 5. Retaliation

In his complaint, Lewis expressed fear that he would be subjected to retaliation because of the grievances he filed and the present suit.  **Id**. ¶ 60.  He also feared transfer to another facility, particularly a maximum security facility, because of the potential to further lower his quality of life.  **Id**. ¶ 61. After filing the August 16 grievance, Lewis stopped receiving packages of food from his family, which he believed was harassment by the prison staff.  **Id**. ¶ 102.  He complained to Captain Early, requested an investigation, and started receiving his packages again.  **Id**.  On December 9, 2005, Lewis was told by two correctional officers that they had overheard three staff members discussing Lewis's complaints, and warned him that those staff members "wanted him out of Woodbourne by any means necessary."  **Id**. ¶ 126.  On December 10, Lewis wrote to two outside parties about his fear that he would be retaliated against.  **Id**. ¶ 127.  On December 12, Sergeant Hyde approached Lewis in his cell and began yelling, threatening Lewis with "keep-lock"[2] and other forms of punishment.  **Id**. ¶ 128.  Approximately an hour later, Lewis was told that Sergeant Hyde had ordered that he submit to a urine test, alleging that he had reason to believe Lewis was using drugs. **Id**. ¶¶ 129-30.  The test was negative.  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) ("Pl. Mem."), at xii.

---

[2]Lewis does not explain this term in his complaint.

**B.  Factual Allegations by Plaintiff Smith**

Smith is currently serving a sentence for manslaughter.  Compl. ¶ 4.  He suffered a severe

heart attack on June 20, 2004, and is diagnosed with systolic dysfunction, or systolic heart

failure.  **Id**. ¶ 14.  He underwent angioplasty treatment and the insertion of three stents into his

arteries to increase blood flow to the heart.  **Id**. ¶ 16.  He also had a pacemaker implanted to treat

the damage done by his heart attack.  **Id**. ¶75.  He was prescribed the same behavioral regimen as

Lewis, which was to exercise moderately; stop any activity that caused chest pain, discomfort,

tightness in the chest, or shortness of breath; lose weight; and avoid heat, humidity, physical

stress, mental stress, and overexertion.  **Id**. ¶ 18.

**1.  Medical Trips and Transfer Policy**

On August 24, 2004, Smith was transferred to Woodbourne.  **Id**. ¶ 77.  During the bus

ride there, Smith suffered severe chest pain and swelling in his extremities, and was taken to a

medical facility.  **Id**.  On March 30, 2005, he was on another medical trip when he began

vomiting and experiencing chest pains.  **Id**. ¶ 78.  His cardiologist recommended to Woodbourne

that they not put him on hub trips because of the risk to his health.  **Id**.  Dr. Makram supported

the recommendation by Smith's cardiologist, but Lowry denied the request.  **Id**. ¶ 79.  When

Smith refused to go on future hub trips because of his health, he was issued a misbehavior report

for refusing medical trips.  **Id**. ¶ 80.  At the hearing, Nurse Boyd testified on Smith's behalf,

noting his need for direct van trips because of his heart condition, and he was found not guilty.

**Id**.  On April 28, 2005, Smith was awakened at 3:00 a.m. for a medical trip.  **Id**. ¶ 81.  During

the trip, he began vomiting and was given a drug to treat his motion sickness, but the medicine

did not alleviate the symptoms.  **Id**.  Smith spent more than fourteen hours chained, shackled,

cuffed and black-boxed.  **Id**.  When he arrived back at Woodbourne, an injury report was filed

based on the injuries resulting from the trip.  **Id**.  He could not eat for three days, and was unable

to use his hands for four days.  **Id**. ¶ 82.  Chiavaro was informed of Smith's injuries, and

promised to correct the problems with the trips.  **Id**.

On May 9, 2005, Smith refused an outside trip.  **Id**. ¶ 83.  Lowry issued a misbehavior

report, but later dismissed it.  **Id**.  Lowry informed Nurse Boyd that, instead of providing direct

trips, Smith would be the last prisoner picked up, and the first prisoner dropped off, on hub trips.

**Id**.  On June 10, Smith was taken for a medical appointment.  **Id**. ¶ 84.  He was the last prisoner

picked up and the first prisoner dropped off, but, because he was transported with four other

prisoners, he could not be transported back to Woodbourne until their procedures were finished.

**Id**.  Smith was chained, shackled, cuffed and black-boxed for more than twelve hours, which

caused him to experience chest pains, nausea and swelling of the extremities.  **Id**.

### 2.  Other Permits

In June 2005, Smith met with Dennis Smith, a nurse at Woodbourne, to address the

health problems the heat and humidity were causing him.  **Id**. ¶ 85.  Nurse Smith wrote Smith a

permit allowing him to receive ice two times a day, which provided relief from the heat.  **Id**.

However, when Smith requested that the permit be renewed, he was told that providing ice was

too inconvenient for the security staff and, therefore, the permit would not be renewed.  **Id**.

Smith did receive a permit allowing him to avoid the heat.  **Id**. ¶ 86.  He requested a

permit that would allow him access to the yard for a shortened period of time so that he could

exercise outside, but this request was refused.  **Id**. ¶ 87.  He has refused to go on medical trips

during the summer months.  **Id**. ¶ 86.  Smith has not filed any grievances, nor otherwise

attempted to exhaust his administrative remedies.  Pl. Mem. at xi.

### III.  DISCUSSION

**A.  Lewis's Claims for Injunctive Relief**

Since the filing of the complaint, Lewis has been released from prison on parole.  Lewis acknowledges that his release makes all claims for injunctive relief on his behalf moot.  As such, I recommend that these claims be **DISMISSED**, and will not address their merits in this opinion.

**B.  Standard of Review for Rule 12(b)(1) and Rule 12(b)(6) Motion**

In considering a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court must assume as true factual allegations in the complaint.  *See* **Shipping Fin. Servs. Corp. v. Drakos**, 140 F.3d 129, 131 (2d Cir. 1998) (*citing* **Scheuer v. Rhodes**, 416 U.S. 232, 236 (1974)).  In doing so, the court may consider extra-pleading material.  **Filetech S.A. v. France Telecom S.A.**, 157 F.3d 922, 932 (2d Cir. 1998) (*quoting* **Antares Aircraft, L.P. v. Fed. Republic of Nigeria**, 948 F.2d 90, 96 (2d Cir. 1991), *vacated on other grounds*, 505 U.S. 1215 (1992)).  A Rule 12(b)(1) motion is appropriate when a plaintiff's federal claim is not even minimally plausible.  *See* **Town of West Hartford v. Operation Rescue,** 915 F.2d 92, 100 (2d Cir. 1990) (*internal citations omitted*); *see also* **AVC Nederland B.V. v. Atrium Inv. P'ship**, 740 F.2d 148, 152-53 (2d Cir. 1984).  In most cases, the court will consider a 12(b)(1) motion before ruling on any other motions to dismiss, since dismissal of an action for lack of subject matter jurisdiction will render all other accompanying defenses and motions moot.  **United States ex rel Kreindler & Kreindler v. United Tech. Corp.**, 985 F.2d 1148, 1155-56 (2d Cir. 1993); *see also* **Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n**, 896 F.2d 674, 678 (2d Cir. 1990).  Thus, a court confronted with a motion to dismiss pursuant to both Rules 12(b)(1) and

12(b)(6) should decide the jurisdictional question first because "a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." **Magee v. Nassau County Medical Center**, 27 F. Supp. 2d, 154, 158 (E.D.N.Y. 1998); ***see also***, **Rhulen**, 896 F.2d at 678.

A motion to dismiss under Rule 12(b)(6) should be granted only if it appears beyond doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." **H.J., Inc. v. Northwestern Bell Tel. Co.**, 492 U.S. 229, 249-50 (1989) (***quoting*** **Hishon v. King & Spalding**, 467 U.S. 69, 73 (1984)).  In reviewing a 12(b)(6) motion, a court must accept as true all factual allegations contained in the complaint and must draw all reasonable inferences in favor of the plaintiff.  **Hishon**, 467 U.S. at 73.  However, the court does not have to accept as true "conclusions of law or unwarranted deductions of fact."  **First Nationwide Bank v. Gelt Funding Corp.**, 27 F.3d 763, 771 (2d Cir. 1994) (***quoting*** 2A Moore & Lucas, MOORE'S FEDERAL PRACTICE ¶ 12.08, at 2266-69 (2d ed.1984)).  Review in this context is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." **Villager Pond, Inc. v. Town of Darien**, 56 F.3d 375, 378 (2d Cir. 1995) (***quoting*** **Scheuer**, 416 U.S. at 235-36).

Pleadings prepared by *pro se* plaintiffs are held to less stringent standards than those prepared by lawyers.  ***See*** **Boddie v. Schneider**, 105 F.3d 857, 860 (2d Cir. 1997) (***citing*** **Haines v. Kerner**, 404 U.S. 519, 520 (1997) (***per curium***)).  Accordingly, some courts consider the facts alleged in a *pro se* plaintiff's opposition papers, where those allegations are consistent with the allegations in the complaint.  ***See,*** **Gill v. Mooney**, 824 F.2d 192, 195 (2d Cir. 1987) (considering allegations in *pro se* plaintiff's affidavit submitted in opposition to motion to

12

dismiss); **<u>Riordan v. Am. Fed'n of Gov't Employees</u>**, 2001 WL 1352464, at * 3 n. 5 (S.D.N.Y.

Nov. 1, 2001) (considering factual allegations in an affidavit that were consistent with allegations

in the amended complaint); ***see also* <u>Gregory v. Daly</u>**, 243 F.3d 687, 691 (2d Cir. 2001) (noting

that courts may consider "not only the assertions made within the four corners of the complaint

itself, but also those contained in documents attached to the pleadings or in documents

incorporated by reference").  Courts may also consider "documents that are 'integral' to

plaintiff's claims," even if they are outside the pleadings.  **<u>Martinez v. Williams</u>**, 186 F. Supp.

2d 353, 355 (S.D.N.Y. 2002) (***internal citations omitted***).

   *Pro se* plaintiffs are not, however, completely relieved of pleading requirements.  In order

to avoid dismissal, a plaintiff must do more than plead mere "[c]onclusory allegations or legal

conclusions masquerading as factual conclusions."  **<u>Gebhardt v. Allspect, Inc.</u>**, 96 F. Supp. 2d

331, 333 (S.D.N.Y. 2000) (***quoting*** 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE

¶ 12.34[1][b] (3d ed. 1997)).  Civil rights complaints brought pursuant to 42 U.S.C. § 1983

"must contain specific allegations of fact which indicate a deprivation of constitutional rights;

allegations which are nothing more than broad, simple, and conclusory statements are insufficient

to state a claim under § 1983."  **<u>Alfaro Motors, Inc. v. Ward</u>**, 814 F.2d 883, 887 (2d Cir. 1987)

(***internal citations omitted***).

## C.  12(b)(1) Motion

   Lewis and Smith brought suit against all defendants in both their individual and official

capacities.  Defendants object to being sued in their official capacities, claiming that such a suit

would violate the Eleventh Amendment.  The Court agrees.  Neither states, nor state officials,

"acting in their official capacities, are 'persons' under §1983." **Will v. Michigan Dep't of State Police**, 491 U.S. 58, 71 (1989).  Since New York State has neither consented to suit, nor waived immunity, all claims for monetary relief against defendants in their official capacities are barred by the Eleventh Amendment, and defendants' motion to dismiss these claims should be **GRANTED**.

## D.  Exhaustion of Administrative Remedies

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The exhaustion requirement of § 1997e(a) "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." **Porter v. Nussle**, 534 U.S. 516, 532 (2002).  The statute mandates that the prisoner properly exhaust all available remedies, including in cases where the prisoner seeks remedies unavailable in grievance procedures, such as monetary damages.  **Id**. at 524 (*citing* **Booth v. Churner**, 532 U.S. 731, 739-41 (2001)); *see also* **Woodford v. Ngo**, 126 S.Ct. 2378, 2387-88 (2006).

Exhaustion requires a prisoner to "grieve his complaint . . . up through the highest level of administrative review."  **Porter v. Goord**, 2002 WL 1402000, at *1 (S.D.N.Y. June 28, 2002) (*citing* **Neal v. Goord**, 267 F.3d 116, 122-23 (2d Cir. 2001)).  Where a prisoner fails to strictly comply with all steps in the grievance procedure, "dismissal must follow 'inexorably.'" **McCoy v. Goord**, 255 F. Supp. 2d 233, 246 (*quoting* **Mendoza v. Goord**, 2002 WL 31654855, at *1

(S.D.N.Y. Nov. 21, 2002)); *see also* **Hemphill v. New York**, 198 F. Supp. 2d 546, 549

(S.D.N.Y. 2002) (requiring "strict compliance" with grievance procedure).  Furthermore, the

PLRA precludes courts from staying, rather than dismissing, an action pending the inmate's

exhaustion.  *See* **Neal**, 267 F.3d at 122.  Therefore, exhaustion must be effectuated prior to the

filing of the complaint.

The New York State DOCS has in place a three-step review process, known as the Inmate

Grievance Program ("IGP").  *See* 7 N.Y.C.R.R. §§ 701 *et seq.*; **Hernandez v. Greiner**, 2000 WL

520639, at *2 (S.D.N.Y. May 1, 2000).  First, the inmate must file a grievance complaint which

is investigated and reviewed by a committee.  *See* 7 N.Y.C.R.R. § 701.5.  Second, the inmate

may appeal the committee's decision to the superintendent of the facility.  **Id**.  Finally, the

prisoner can appeal the superintendent's decision to the Central Office Review Committee.  **Id**.

### 1.  Plaintiff Lewis's Claims

Defendants argue that Lewis has failed to exhaust all of his claims, with the exception of

his flats housing assignment and retaliation claims.  Def. Mem. at 13.  Lewis contends that he has

administratively exhausted, or has reason to believe he has exhausted, all claims.  Pl. Mem. at xi.

He claims that his August 16, 2005 grievance raised the issues of his flats housing assignment,

problems receiving his recommended medical treatment, and retaliation.  Compl. ¶ 97.  This

grievance was amended by Lewis on August 22 and, on September 7, IGRC held a hearing on it.

Compl. ¶¶ 98, 101.  When Cunningham rejected the IGRC resolution, Lewis appealed

Cunningham's determination to CORC, where it was affirmed.  Therefore, Lewis properly

exhausted his administrative remedies for each of the claims raised in the August 16 grievance,

15

including the addendum.  Since defendants acknowledge that Lewis's flats housing and

retaliation claims are properly exhausted, the only dispute is whether the claim that the

defendants failed to comply with the recommended medical treatment is exhausted.  A review of

Lewis's grievance shows that, in addition to the flats housing and retaliation claims, he raised the

issue of his cardiologist's recommendation that he avoid the sun and heat; the effect that the

August 4, 2005 order to move cells had on his health; interference with his attempts to get ice;

the number of stairs he has to climb, and the problems with access to exercise and food that this

causes; and that, during certain hours, there was no correctional officer present in the unit to

assist him if he had a heart attack.  Compl., Exh. 28.  These allegations appear to raise the issue

that defendants have failed to comply, at least to some degree, with the treatment recommended

by Lewis's cardiologists.  This is buttressed by the CORC response, which states that the facility

physicians "have the sole responsibility for providing treatment to the inmates" and the

implementation of the recommendations of outside specialists is "at the discretion of" the

facility.  **Id**., Exh. 34.  Thus, to the extent that Lewis's claim of deliberate indifference is based

upon the allegations of defendants' failure to comply with recommended treatment contained in

his August 16 grievance, that claim has been properly exhausted.

Lewis's deliberate indifference claim is also based on the medical trip and transfer

procedures he was subjected to during incarceration.  Defendants argue that this claim has not

been properly exhausted.  Def. Mem. at 13.  While Lewis acknowledges that he never raised this

claim by filing a grievance, he argues that this claim should not be barred because he "reasonably

believed" he had exhausted all available remedies.  Pl. Mem. at 15.  Lewis's claim is based on

his allegations, which this Court must accept as true, that he was told both by Cunningham and

the civilian supervisor at IGRC that filing a grievance was not the proper method to address his complaints about medical trips and transfer policy.  Even when a plaintiff fails to administratively exhaust his claims, "there are certain 'special circumstances' in which . . . the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified."  **Giano v. Goord**, 380 F.3d 670, 676 (2d Cir. 2004) (finding that the prisoner's reasonable interpretation of a DOCS regulation constituted "special circumstances") (***internal citations omitted***).  Here, Lewis alleges facts that, if true, are sufficient to justify his failure to exhaust his administrative remedies, and defendants have failed to meet their burden in asserting the affirmative defense of failure to exhaust.  ***See* Jenkins v. Haubert**, 179 F.3d 19, 28-29 (2d Cir. 1999). Therefore, defendants' motion to dismiss Lewis's claim of deliberate indifference, to the extent the claim is based on the failure to comply with treatment recommendations and the medical trip and transfer policy, for failure to exhaust administrative remedies should be **DENIED**.

### 2. Plaintiff Smith's Claims

Defendants argue that all of Smith's claims should be dismissed for failure to exhaust administrative remedies.  Def. Mem. at 13.  Smith has never filed a grievance in accordance with the New York State DOCS grievance review process.  To the extent that the IGP may not have been the proper forum for complaints about medical trips and transfers, Smith also failed to pursue other methods of complaint regarding these issues.  Smith alleges that he was prevented from exhausting his administrative remedies out of fear that he would be subjected to threats and retaliation.  Pl. Mem. at 14.  He claims that witnessing the threats and retaliation Lewis was subjected to after making his complaints deterred him from filing grievances because "any form

17

of retaliation would most likely lead to the possibility of loss of his life." **Id**.

In order to determine whether a plaintiff's claim can survive a defendant's contention that administrative remedies were not exhausted, a court should inquire as to "whether administrative remedies were in fact 'available' to the prisoner." **Hemphill v. New York**, 380 F.3d 680, 686 (2d Cir. 2004) (*citing* **Abney v. McGinnis**, 380 F.3d 663, 667 (2d Cir. 2004)).  "[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable." **Id**.  Threats by prison officials, for example, may render administrative remedies unavailable if the threats would have deterred an individual of "ordinary firmness" from filing a grievance.  **Id**. at 688.

Here, Smith was not the target of threats, but instead claims that the threats Lewis received would have deterred a person of "ordinary firmness." **Id**.  However, in spite of the threats Lewis himself received, he still filed grievances and pursued other channels of complaint. Moreover, the first action that Lewis characterizes as a threat was Dr. Lancellotti's statement that he would transfer him north to a correctional facility in a cooler climate, and this occurred on May 26, 2005.  The threats of physical harm and other retaliatory behavior Lewis experienced occurred between August and December 2005.  However, the medical trips that Smith claims demonstrate defendants' deliberate indifference to his serious medical needs occurred on March 30, April 28, May 9, and June 10, 2005.  Since the only threat Smith would have been aware of would have been Dr. Lancellotti's transfer comment, which occurred after the third instance of deliberate indifference, it is not plausible that he failed to exhaust his administrative remedies out of fear of retaliation.  Smith's second argument is that he was prevented from exhausting his administrative remedies because the law library, where he would need to conduct research, is

18

"extremely hot and difficult to work in."  Def. Mem. at xi.  This claim is also without merit.

First, Smith does not allege that legal research was necessary to either file or exhaust an IGP

grievance.  Second, having filed a federal lawsuit, Smith has clearly managed to conduct legal

research, or have it conducted on his behalf, in spite of the constraints imposed by the law

library.  The defendants' motion to dismiss all claims by Smith for failure to exhaust

administrative remedies should be **GRANTED**.

### E.  Deliberate Indifference to a Serious Medical Need

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth

Amendment and "states a cause of action under § 1983."  **Estelle v. Gamble**, 429 U.S. 97, 104-

05 (1976).  In order to constitute deliberate indifference, a plaintiff must allege (1) a deprivation

that is, "in objective terms, 'sufficiently serious'" and (2) that the "charged official . . . [acted]

with a sufficiently culpable state of mind."  **Hathaway v. Coughlin**, 37 F.3d 63, 66 (2d Cir.

1994) (*quoting* **Wilson v. Seiter**, 501 U.S. 294, 298 (1991)).  "[A] prison official does not act in

a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk

to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference.'"  **Id**. (*quoting* **Farmer v. Brennan**, 511 U.S. 825, 837 (1994)).

Defendants argue that Lewis's claim of deliberate indifference to a serious medical need

should be dismissed because the allegations, even taken as fact, do not rise to the level of

deliberate indifference.  Def. Mem. at 14.  Defendants base their argument largely on the care

that Lewis received, arguing that there could have been no serious deprivation because they

provided him with so much medical attention.  **Id**. at 16.  However, it is possible that Lewis's

allegations, under a set of consistent facts, could constitute a deprivation of sufficient

seriousness.  His doctors prescribed, as part of his treatment for systolic heart failure, that he

exercise moderately through walking; stop any activity that caused chest pain, discomfort,

tightness in the chest, or shortness of breath; lose weight; and avoid heat, humidity, physical

stress, mental stress, and overexertion.  Compl. ¶¶ 18, 31-32.  Lewis alleges that defendants

interfered with the prescribed treatment by denying and delaying appropriate housing placement;

subjecting him to medical trips and transfers that were physically and mentally taxing; and

denying or delaying permits that would have allowed him to avoid the heat.  As described by

Lewis in his complaint, these allegations rise to the level of a serious deprivation.

Defendants claim that Lewis has "failed to allege facts sufficient to meet the subjective

prong of the deliberate indifference test" because the amount of medical care they provided him

makes it impossible for them to have acted indifferently.  **Id**. at 16.  To survive the motion to

dismiss, Lewis must have alleged facts demonstrating that the defendants knew of and

disregarded "an excessive risk" to his health or safety.  **Hathaway**, 37 F.3d at 66 (***quoting***

**Farmer**, 511 U.S. at 837).  Lewis alleges that he verbally told Dr. Lancellotti, Dr. Makram, and

Nurse Boyd about the deprivations, and that all three defendants were involved in his attempts to

secure permits to facilitate his treatment.  Lewis also claims that he spoke to Cunningham about

the medical trip and transfer policy, and that Cunningham was personally involved in and aware

of the grievances Lewis filed.  While Lewis does not claim to have personally told Chiavaro or

Lowry of the deprivations, he alleges that Chiavaro is responsible for various aspects of the

Woodbourne Medical Department and that Lowry is responsible for security at Woodbourne.

20

Lewis's allegations that, based on their respective job duties, Chiavaro and Lowry knew of the risk to Lewis's health are sufficient to survive the motion to dismiss.  Lewis's complaint also survives the second prong of the deliberate indifference test as to Wright.  Believing that defendant Wright was the appropriate person to bring his concerns about medical trips to, Lewis sent him a copy of a detailed letter he had written to the Department of Health, and asked him to review it.  Compl., Exh. 38.  Wright had Pedro Diaz respond to Lewis on his behalf.  Compl., Exh. 39.

However, Lewis does not allege that Pataki or Goord were ever personally informed of, and disregarded, an excessive risk to his health or safety.  His only allegations with regard to these two defendants is that there were several articles written detailing trends in prison health care, and that these articles should have caused Pataki and Goord to make the changes necessary to meet the needs of elderly, chronically ill" prisoners.  Compl. ¶¶ 20-27.  These assertions are not sufficient to state a claim of deliberate indifference on the part of Pataki and Goord.  Therefore, defendants' motion to dismiss for failure to state a claim of deliberate indifference to a serious medical need should be **DENIED** as to Cunningham, Lowry, Chiavaro, Lancellotti, Makram, Boyd and Wright, and **GRANTED** as to Pataki and Goord.

## F.  No Personal Involvement of Defendants in Alleged Constitutional Violation

In order to sustain a § 1983 claim for damages, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite." **McKinnon v. Patterson**, 568 F.2d 930, 934 (2d Cir. 1977) (***internal citations omitted***).  A plaintiff's complaint must "allege a tangible connection between the acts of a defendant and the injuries suffered." **Bass v. Jackson**, 790 F.2d

260, 263 (2d Cir. 1986).  When a suit is brought against those in supervisory positions, plaintiff

must "allege the defendant's direct and personal responsibility for the purportedly unlawful

conduct of his subordinates."  **Black v. United States**, 534 F.2d 524, 527 (2d Cir.1976).  A

supervisory official will be directly and personally responsible for the violation "if he or she (1)

directly participated in the violation; (2) failed to remedy the violation after learning of it through

a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or

policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates

who caused the violation."  **Sealey v. Giltner**, 116 F.3d 47, 51 (2d Cir. 1997) (*citing* **Williams v.**

**Smith**, 781 F.2d 319, 323-34 (2d Cir. 1986)).

### 1.  Defendant Wright

Defendant Wright asserts that the claim of deliberate indifference against him must be

dismissed because Lewis does not allege any personal involvement by him in the constitutional

violations.  Def. Mem. at 27.  Lewis's claim against Wright is based on his position as a

supervisory official.  Compl. ¶ 13.  Lewis alleges that he informed Wright of the violations

through his letter to the Department of Health, and that Wright failed to remedy the violation.

Lewis also alleges that, based on information provided by Cunningham and the civilian

supervisor of the IGRC, that medical trip procedures and transfers were DOCS policy issues, and

that Wright was the person responsible.  **Id**. ¶ 117.  Under the second prong of the standard for

liability for a supervisory official, Lewis has alleged sufficient acts to withstand a motion to

dismiss.  Therefore, defendants' motion to dismiss Lewis's claim of deliberate indifference

against Wright should be **DENIED**.

### 2. Defendant Boyd

Boyd also asserts that the claim of deliberate indifference against her should be dismissed on the basis that Lewis fails to allege any violation of his constitutional rights by her.  Def. Mem. at 28.  Boyd claims that the only references to her in the complaint involve her providing assistance to Lewis, and that there are no examples of her personal involvement in the alleged constitutional violations.  **Id**.  It is true that Lewis's complaint contains no specific factual allegations of personal involvement by Boyd.  While he makes the conclusory allegation that Boyd failed to take the "necessary steps to administer appropriate and adequate medical care," he does not cite a single act or omission supporting this statement.  Compl. ¶ 89.  Lewis also alleges that the "medical defendants," whom he defines as Boyd, Makram, and Lancellotti, refused to request necessary medical permits, *see* Pl. Mem. at iv, but never alleges that he asked Boyd to request such a particular permit, and she refused.  Lewis, however, does allege that Boyd, as Nurse Administrator, was a supervisory official.  Compl. ¶ 10.  According to the complaint, Boyd is responsible "for the day-to-day review of medical and staff protocol," "reviewing complaints filed by prisoners about medical conditions or medical staff conduct," "coordinating outside medical trips," and "determin[ing] and plan[ning] clinical approaches to meeting the medical needs of prisoners at Woodbourne."  **Id**.  Since Lewis has not yet been able to engage in discovery, and his factual allegations must be presumed true, it cannot be said that, based on his complaint, there is no set of facts consistent with these allegations that would support his claim that Boyd was personally involved with the constitutional violations. Therefore, defendants' motion to dismiss Lewis's claim of deliberate indifference against Boyd should be **DENIED**.

**G.  Retaliation Claim**

Lewis maintains that he was subjected to adverse treatment in retaliation for his verbal and written complaints challenging his treatment at Woodbourne.  In order for the retaliation claim to survive dismissal, Lewis must advance non-conclusory allegations demonstrating that: 1) the conduct or speech was protected; 2) that defendants took adverse action against him; and 3) that there was a causal connection between the protected conduct, and the adverse action. ***See, e.g.,*** **Diesel v. Town of Lewisboro**, 232 F.3d 92, 107 (2d Cir. 2000); **Graham v. Henderson**, 89 F.3d 75, 79 (2d Cir. 1996) (***internal citations omitted***).  Moreover, because "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike," **id**. (***internal citation omitted***), these claims should be approached with "skepticism and particular care." **Scott v. Gardner**, 287 F. Supp. 2d 477, 492 (S.D.N.Y. 2003) (***quoting* Dawes v. Walker**, 239 F.3d 489, 491 (2d Cir. 2001)).  Defendants argue that Lewis's claim of retaliation should be dismissed because (1) all of his accusations are "conclusory," (2) he fails to allege any adverse action and (3) he fails to allege any personal involvement by any of the named defendants in the retaltion.  Def. Mem. at 29, 31.

Lewis's claim meets the first prong since filing grievances and lodging other complaints about his treatment at Woodbourne was clearly protected speech.  However, Lewis's claim fails on the second prong in that he does not allege that defendants took adverse action against him.  Only Dr. Lancellotti is alleged to have been personally involved in any of the adverse actions taken against Lewis.  Lewis's other claims of allegedly adverse actions, many of which do not appear to be exhausted, involve other Woodbourne staff who are not defendants in the instant case.  He does not allege that these acts were done at the behest of any of the named defendants,

or even that the named defendants were aware of them.  To the extent Lewis claims that Dr.

Lancellotti retaliated against him, this claim fails because Dr. Lancellotti's threat about having

Lewis "transferred to Attica or Clinton (maximum security prisons) where it would not be so

hot" does not, without more, constitute adverse action.  Compl. ¶ 46.  Lewis has failed to

demonstrate that Dr. Lancellotti's threat would have deterred "a similarly situated individual of

ordinary firmness from exercising his or her constitutional rights."  **Dawes**, 239 F.3d at 493

(finding that referring to a prisoner as a "rat" and "informant" does not constitute adverse action).

Lewis filed his grievances and wrote to Dr. Wright regarding the medical trip and transfer policy

after being threatened with transfer by Dr. Lancellotti.  Therefore, Dr. Lancellotti's threat did not

deter Lewis himself from exercising his constitutional rights.  Moreover, Lewis does not allege

that Dr. Lancellotti ever attempted to carry out the threat, or even whether he had the power to

transfer Lewis to another facility.  Lewis has failed to advance non-conclusory allegations

sufficient to demonstrate that defendants took adverse action against him.  Therefore, defendants'

motion to dismiss all claims of retaliation should be **GRANTED**.

**H.  Assertion of Qualified Immunity**

Government employees are entitled to qualified immunity from civil damages "insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982).  The

Supreme Court has noted that "[w]here the defendant seeks qualified immunity, a ruling on that

issue should be made early in the proceedings so that the costs and expenses of a trial are avoided

where the defense is dispositive."  **Saucier v. Katz**, 533 U.S. 194, 200 (2001).  Viewing the

matter "in the light most favorable to the party asserting the injury," the court must determine

whether the facts alleged show the defendants' conduct violated a constitutional right.  **Id**. at 201.

A complaint will be dismissed unless the "alleged conduct, when committed, violated 'clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

**Williams v. Smith**, 781 F.2d 319, 322 (2d Cir. 1986) (*quoting* **Harlow**, 457 U.S. at 818).

Moreover, even if a plaintiff's constitutional rights are well-established, "qualified immunity is

still available to an official if it was 'objectively reasonable for the public official to believe that

his acts did not violate those rights.'" **Hathaway v. Coughlin**, 37 F.3d 63, 67 (2d Cir. 1994)

(*quoting* **Kaminsky v. Rosenblum**, 929 F.2d 922, 925 (2d Cir. 1991)).

Defendants argue for the dismissal of Lewis's claims for monetary damages on the basis

that he has not accused defendants "of any action that would defeat their qualified immunity."

Def. Mem. at 31.  Since Lewis's rights under the Eighth Amendment were "well-established" at

the time of the alleged violations, **Hathaway**, 37 F.3d at 67, the issue is whether it was

"objectively reasonable" for defendants to believe that their actions did not violate Lewis's

rights.  **Id**. (*quoting* **Kaminsky**, 929 F.2d at 925).  Under this standard, Lewis's allegations

defeat the assertion of qualified immunity as an affirmative defense by Cunningham, Chiavaro

and Lowry.  Lewis accuses Cunningham, Chiavaro and Lowry of being aware of and, to the

extent that the denial of permits interfered with prescribed medical treatment, participating in

ongoing deprivations of sufficient seriousness to constitute deliberate indifference to a serious

medical need.  If the allegations are true, it was not "objectively reasonable" for Cunningham,

Chiavaro and Lowry to believe that their actions were lawful.  Lewis's allegations also defeat

Wright's assertion of qualified immunity because, assuming his responsibility for the medical

trips and transfers policy, he also could not reasonably believe that his actions in response to

Lewis's letter were not in violation of Lewis's rights.  In contrast, with respect to Lancellotti, Makram and Boyd, they are not alleged to have purposefully interfered with treatment or denied Lewis a housing assignment that jeopardized his life.  The factual allegations by Lewis against these three defendants, even taken as true, do not constitute any actions that would not survive the defense of qualified immunity.

While Cunningham, Chiavaro, Lowry and Wright may successfully argue qualified immunity later in the litigation, at this stage, it is too early to declare defendants protected by a qualified immunity defense.  Therefore, the defendants' motion regarding qualified immunity should be **GRANTED** as to Lancellotti, Makram and Boyd, and **DENIED**, without prejudice, as to Cunningham, Chiavaro, Lowry and Wright.

### I.  Motion for Class Certification

Finally, defendants object to Lewis's request that the Court certify a class in this case on three grounds: (1) a *pro se* plaintiff cannot represent a class; (2) Lewis has not properly moved for class certification; and (3) the injuries alleged by Lewis are not sufficiently similar to form a class.  Def. Mem. at 33-35.  An individual may sue as a representative party on behalf of a class "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative part[y] will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a).  If the recommendation is approved, and Smith's claims for failure to exhaust are dismissed, Lewis would be the only plaintiff remaining in the instant case.  Having been released on parole, Lewis

cannot fairly and adequately represent a class of prisoners with chronic heart conditions.  For

example, Lewis can no longer maintain his claims for injunctive relief, whereas those prisoners

still incarcerated have a strong interest in the potential for injunctive relief.  For the foregoing

reasons, Lewis's request for class certification should be **DENIED**.  Having found Lewis to be

unable to fairly and adequately represent the class, it is unnecessary to address defendants other

substantive and procedural challenges to Lewis's motion for class certification.

## IV.  CONCLUSION

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days

after being served with a copy of the recommended disposition to file written objections to this

Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and

served on all adversaries, with extra copies delivered to the chambers of the Honorable George

B. Daniels, 500 Pearl Street, Room 630, and to the chambers of the undersigned, Room 1970.

Failure to file timely objections shall constitute a waiver of those objections both in the District

Court and on later appeal to the United States Court of Appeals.  *See* **Thomas v. Arn**, 474 U.S.

140, 150 (1985); **Small v. Secretary of Health and Human Services**, 892 F.2d 15, 16 (2d Cir.

1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: May 24, 2007**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent to:

**Plaintiffs, _Pro Se_**
John L. Lewis
64 Vincent Street
Kingston, NY 12401

**Respondent**
Efthimios Parasidis
New York State Office of the Attorney General
120 Broadway
New York, NY 10271