USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-14-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JOHN LEWIS,                          :
                                     :
                      Plaintiff,     :        REPORT AND
                                     :        RECOMMENDATION
        - against -                  :
                                     :        05 Civ. 9243 (GBD) (RLE)
RAYMOND CUNNINGHAM, et al.,          :
                                     :
                      Defendants.    :
_____

To the HONORABLE GEORGE B. DANIELS, U.S.D.J.:

## I. INTRODUCTION

On November 8, 2007, John L. Lewis, a former New York State prisoner, filed his Third

Amended Complaint alleging inadequate medical treatment at Woodbourne Correctional Facility

("Woodbourne") for his cardiac condition in violation of the Eighth Amendment. (Third Am.

Compl. ("Compl.") ¶¶ 1, 8.) He seeks compensatory and punitive damages (*Id.* ¶ 1), and has

sued Defendants in their individual capacities. (*Id.* ¶¶ 4-7.) Pending before the Court is

Defendants' motion for summary judgment. (Doc. No. 79.) For the following reasons, I

recommend that the motion be **GRANTED** and Plaintiff's claims be **DISMISSED**.

## II. BACKGROUND

### A. Facts

Lewis suffers from a heart condition in addition to other medical ailments and suffered

two heart attacks in March 2001. (Compl. ¶ 23.) He received angioplasty treatment through a

cardiac catheterization. (*Id.*) Physicians at Westchester Medical Center advised Lewis to

exercise, eat a "cardiac diet," and avoid stairs, heat and humidity. (Pl.'s Decl., Ex. A, Lewis Dep.

("Lewis Dep.") at 19-21, 26.) Lewis also developed pain in his lower leg and was initially told it

was the result of his heart condition, but Dr. Tartaglia at Westchester Medical Center later determined that it was unrelated. (Compl. ¶¶ 27-29.) On August 4, 2005, Lewis was diagnosed with diabetes at Albany Medical Center, where he was taken after suffering from heat stroke. (Lewis Dep. at 35-36.)

Lewis alleges that Defendants exhibited deliberate indifference to his medical needs by denying or delaying an appropriate housing placement in violation of Lewis's flats permit; subjecting him to medical trips and transfers that induced a high amount of physical and mental stress; and denying or delaying permits that would have allowed Lewis to avoid the heat. (*See* Mem. Decision and Order, Aug. 22, 2007, at 4-7.) His allegations address the time period beginning April 22, 2005, when he was transferred from Mid-Orange Correctional Facility to Woodbourne Correctional Facility, and ending November 28, 2006, when he was released on parole. (Compl. ¶¶ 3, 65.) Lewis states that because of his experience at Woodbourne he "lost heart function . . . [and the] ability to do anything physical." (Lewis Dep. at 149.)

1. Housing and Travel

Many of Lewis's allegations pertain to the number of stairs he frequently had to use at Woodbourne. Lewis states that during his first two weeks at Woodbourne, he was housed in a non-ground floor cell in contravention of his flats permit. (Lewis Dep. at 70-71.) A flats permit allows an inmate to be housed in a location which requires minimal stair usage to reach essential parts of the building. (Def.s' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem."), at 4.) A flats permit can only be revoked or discontinued by a doctor. Lewis filed a grievance with Defendant Raymond Cunningham on August 16, 2005, complaining that he still had to use some stairs. (Defs.' Mem. at 4.) He concedes, however, that the permit does not eliminate the need to use stairs. (Pl.'s Rule 56.1 Statement ¶ 54.) Lewis states that Dr. Lancellotti, the Woodbourne

2

physician treating him, told him that walking up some stairs would be good exercise for him. (Lewis Dep. at 70.) According to Defendants, an inmate with a heart condition who feels that climbing stairs is detrimental to his health may request a transfer to another facility. (Wright Decl. ¶ 15.)

Lewis also complained to Cunningham that he was not housed on a medical unit. (Defs.' Mem. at 19). Cunningham responds that because Woodbourne does not have medical units (*Id.* at 4), and because Lewis's physicians approved his transfer to Woodbourne, Cunningham had no reason to question Lewis's housing assignment. (*Id.* at 19.)

Lewis's allegations also address the length and conditions of his medical trips. On April 27, 2005, Lewis was taken to Westchester Medical Center for a cardiac cauterization. (Compl. ¶ 33.) On May 2, 2005, he was taken to Albany Medical Center, where it was determined that he had a pseudoanuerysm (internal bleeding). (*Id.* ¶ 34.) On May 18, 2005, he was taken to Albany Medical Center for follow-up on the pseudoanuerysm. (*Id.* ¶ 35.) Lewis alleges that he was awakened at 3:30 a.m., sat in a van for several hours throughout the day, and experienced poor circulation in his hands and feet because of the tight restraints in place from approximately 5:00 a.m. until his appointment. (*Id.*). The handcuffs were not applied as tightly on the trip back pursuant to the physician's instructions to the corrections officers. (Pl.'s Mem. at 7.) On June 8, 2005, Dr. Makram ordered a "no-hubs" trip permit, which allowed Lewis to travel directly from Woodbourne to an outside medical facility without stopping at other facilities. (Compl. ¶ 41.) Nevertheless, Lewis contends that he experienced similar symptoms, including shortness of breath, on another medical trip on June 9, 2005, because of the extremely hot weather. (*Id.* ¶ 39.)

On May 25, 2005, Lewis complained to Dr. Lancellotti about his trip experiences and his need for a fan. Dr. Lancellotti provided a permit for a 20-inch fan. (*Id.* ¶ 38.) The Woodbourne

3

nurse issued Lewis a flats permit and special diet permit; Lewis states that he declined the special diet because retrieving the meal would require him to traverse multiple flights of stairs. (Lewis Dep. at 69.)

     2. Issuance of Permits

     Lewis states that six permits were issued by Dr. Lancellotti on June 16, 2005, and approved by Woodbourne security on June 26, 2005: a flats permit to reside on the ground floor; a permit for a special diet; a permit for an extra fan; a permit to prohibit Lewis from lifting heavy weights; a permit to allow a prison porter to bring Lewis the goods Lewis had purchased from the commissary ("special needs permit"); and a permit to be housed in a unit with a 24-hour guard on duty in case of a medical emergency. (Lewis Dep. at 85-86, 90.)

     Lewis alleges that on July 3, 2005, Sgt. Hopkins stopped a fellow inmate from carrying items from the commissary for Lewis and forbade Lewis from using any of his permits. (Lewis Dep. at 86-88.) After Lewis informed Cunningham of the incident, Cunningham referred the matter for investigation to the Deputy Superintendent of Security, Gonyea. (Cunningham Decl. ¶ 14.) Gonyea subsequently reported to Cunningham that Dr. Makram told Lt. Williams that Lewis's special needs permit had expired and that Hopkins's refusal to honor it was justified. (Defs.' Mem. at 18.) Lewis states that on July 5, 2005 (less than two weeks after the permits were issued), Dr. Makram concluded that Lewis did not need any permits because his files had been purged of all medical records pertaining to his heart condition. (Lewis Dep. at 88-89.) Lewis filed a grievance, and the medical records were placed back into his file. (*Id.* at 89-90.) Lewis states that Dr. Makram re-issued some of his permits (*Id.* at 90), but he did not specify which types.

4

3. Communications with Prison Personnel

Lewis asserts that he spoke to Defendant Cunningham about his problems with exercise, stairs, outside trips, and cell location (Pl.'s Mem. at 8-9) on or about June 22, 2005. (Def.s' Mem. at 8.) He claims that Cunningham told him on two occasions to "Get out of my face" and on three occasions to write to Defendant Lester Wright, the Chief Medical Officer of the New York State Department of Correctional Services ("DOCS") because Albany, not Woodbourne, controlled such decisions. (*Id.* at 9.)

Lewis wrote a letter to Wright regarding his difficulties at Woodbourne, and Lewis's wife spoke to Wright on the telephone. (Pl.'s Mem. at 9.) Lewis asserts that Wright only told him to "hang in there." (Lewis Dep. at 141-42.) Wright explains that after he received the letter on October 2, 2005, he ordered Pedro Diaz, the Regional Health Services Administrator, to investigate Lewis's grievance. Diaz instructed Lewis to consult with Woodbourne staff because housing assignments and the length of outside trips were local facility issues. (Def.s' Mem. at 20-21.)

Lewis claims that in May 2005, or shortly thereafter, he complained to Defendant Steven Lowery, the Deputy Superintendent of Security at Woodbourne, but that Lowery "refused to listen." (Lewis Dep. at 146.) Although the record indicates that Lowery "retired right afterwards," it is unclear exactly when this occurred. (*Id.* at 144.) Lewis also alleges that he spoke to Defendant Peter Chiavaro, Deputy Superintendent of Administrative Services at Woodbourne, on three occasions to complain about medical issues, and each time Chiavaro referred Lewis to other staff. (Pl.'s Mem. at 10.)

## B. Procedural Background

On August 22, 2007, the Honorable George B. Daniels, U.S.D.J., adopting a Report and

Recommendation by the undersigned, denied Defendants' Motion to Dismiss the Complaint.

(Mem. Decision and Order, Aug. 22, 2007, at 4-7.) Discovery having now been completed,

Defendants move for Summary Judgment asserting that: (1) Lewis cannot establish that

Defendants were personally involved in the alleged deprivation of his medical care; (2) Lewis

cannot demonstrate that Defendants were deliberately indifferent to his serious medical needs;

and (3) Defendants are entitled to qualified immunity. (Def.s' Reply Mem. of Law in Further

Support of Their Mot. for Summ. J. ("Def.s' Reply Mem.") at 1.)

### III. DISCUSSION

## A. Standard of Review for Summary Judgment

A court shall grant a motion for summary judgment if, "viewing the record in the light

most favorable to the nonmoving party, the evidence offered demonstrates that there is no

genuine issue of fact and that the moving party is entitled to a judgment as a matter of law."

*Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 138 (2d Cir. 1989); *see also*

FED. R. CIV. P. 56(c). In making this determination, the court does not resolve disputed factual

issues but merely concludes whether there exists a genuine and material issue for trial. *Knight v.*

*U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986). An issue of fact is "genuine" if it provides a

basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Summary judgment is appropriate where no

reasonable trier of fact could find in favor of the nonmoving party, *H. L. Hayden Co. of New*

*York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989), thereby "dispos[ing]

of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v.*

*Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).

The party moving for summary judgment bears the initial burden of demonstrating the

absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*,

996 F.2d 568, 572 (2d Cir. 1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

This burden may be met by demonstrating that there is a lack of evidence to support the

nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the

moving party satisfies this initial burden, the nonmoving party must offer "concrete evidence

from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 256 (1986). "[T]he mere existence of factual issues – where those issues are

not material to the claims before the court – will not suffice to defeat a motion for summary

judgment." *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985); *see also Anderson*,

477 U.S. at 247-48.

**B. Personal Involvement**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism

for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Board of Educ. of*

*Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d. Cir. 2005) (citing *Oklahoma City v.*

*Tuttle*, 471 U.S. 808, 816 (1985)). In order to state a claim under § 1983, a plaintiff "must show

that [the defendant] acted under color of state law and that [the conduct] deprived him of a right

secured by the Constitution or laws of the United States." *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d

Cir. 2004). Furthermore, an award of damages pursuant to § 1983 requires a named defendant to

be personally involved in the alleged constitutional deprivation. *Moffitt v. Town of Brookfield*,

950 F.2d 880, 886 (2d Cir. 1991).

This Circuit has identified five ways in which a defendant may be personally involved in a § 1983 violation: (1) direct participation in the alleged constitutional violation; (2) failure to remedy a wrong after being informed of a violation through a report or appeal; (3) creation of a policy or custom under which unconstitutional practices occurred, or allowing the continuance of such a policy or custom; (4) gross negligence in supervising subordinates who committed the wrongful acts; or (5) exhibiting deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Samuels v. Selsky*, 166 Fed. App'x. 552, 556 (2d Cir. 2006); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004).

While the doctrine of *respondeat superior*, by itself, does not establish liability in § 1983 actions, *see, e.g., Ali v. Szabo*, 81 F. Supp. 2d 447, 462 (S.D.N.Y. 2000), the *Colon* standard has traditionally permitted personal involvement to be established for some supervisors lacking direct participation in the alleged constitutional deprivation. For example, in Eighth Amendment claims regarding inadequate medical care, supervisors have been liable if their actions were "so egregious as to demonstrate 'deliberate indifference' to defendants' rights." *Langley v. Coughlin*, 715 F. Supp. 522, 545 (S.D.N.Y. 1989) (discussing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

However, "precisely what remains of the Second Circuit [personal involvement] rule in light of [*Ashcroft v.*] *Iqbal* is not entirely clear." *Young v. State of New York Office of Mental Retardation and Developmental Disabilities*, 649 F. Supp. 2d 282, 293-94 (S.D.N.Y. 2009). In *Iqbal*, the Supreme Court stated that "in a § 1983 suit . . . where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer . . . [and] each Government official . . . is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949

8

(2009). Some courts in this District have interpreted this language as limiting personal involvement to supervisors who themselves "took an action that deprived the plaintiff of his or her constitutional rights." *De la Rosa v. New York City 33 Precinct*, No. 07 Civ. 7577 (PKC) (KNF), 2010 WL 1737108 at *4 (S.D.N.Y. Apr. 27, 2010) (§ 1983 suit regarding excessive force after physical injury inflicted by officer during arrest); *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939 at *6 (S.D.N.Y. June 26, 2009) ("only the first and part of the third *Colon* categories pass *Iqbal's* muster" so that the supervisor must have an active hand, not merely know of and acquiesce in the alleged deprivation).

Other courts in this District have concluded that *Iqbal* had a more limited "impact on supervisory liability [because] *Iqbal* involved alleged intentional discrimination [and] the Supreme Court specifically held that '[t]he factors necessary to establish a *Bivens* [or § 1983] violation will vary with the constitutional provision at issue.' " *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (quoting *Iqbal*, 129 S.Ct. at 1948). Thus, while *Iqbal's* allegations of First Amendment religious discrimination required a showing of discriminatory intent, the *Colon* analysis may still apply to a constitutional claim based on "the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments." *Id. See also D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (because "*Colon's* bases for liability are not founded on a theory of *respondeat superior*, but rather on a recognition that personal involvement . . . can be shown by nonfeasance as well as misfeasance . . . the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated") (internal quotations omitted).

In claims against prison officials, personal involvement is not satisfied when a defendant merely has knowledge of a violation, *Word v. Croce*, 230 F. Supp. 2d 504, 514 (S.D.N.Y. 2002), or is merely a high-ranking official. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (liability under § 1983 "requires a showing of more than the linkage in the prison chain of command"). Personal involvement is not established when a prison official merely receives an inmate's written grievance. *See, e.g., Ramos v. Artuz*, No. 00 Civ. 0149 (LTS) (HBP), 2001 WL 840131 at *7 (S.D.N.Y. July 19, 2001). Evidence that a defendant ignored a written grievance is similarly insufficient. *See, e.g., Rivera v. Goord*, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000). Even a defendant who responds to an inmate's letter is not necessarily personally involved. *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 183 (N.D.N.Y. 1996). For example, an administrator's response to a medical issue is insufficient to establish deliberate indifference if the administrator himself never provided medical care, *Joyner v. Grenier*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002), since prison administrators may defer to medical staff regarding medical treatment of inmates. *See Liscio v. Warren*, 718 F. Supp. 1074, 1082 (D. Conn. 1989), *rev'd on other grounds*, 901 F.2d 274 (2d Cir. 1990) (citing *McEachern v. Civitelli*, 502 F. Supp. 532, 534 (N.D. Ill. 1980)). However, an administrator who defers to medical staff may be personally involved if the inmate's grievance demonstrates that his medical treatment was egregiously inadequate. *Heron v. Dalsheim*, No. 95 Civ. 2625 (JFK), 1999 WL 2871 at *5 (S.D.N.Y. Jan. 4, 1999) (prison superintendent and medical director personally involved when inmate with leg injury was deprived of crutches yet sanctioned for not standing).

Personal involvement may be established if a prison official ignores a letter that alleges specific grievances that should have prompted the official to investigate. *Colon*, 58 F.3d at 873. A claim for personal involvement could also survive if a supervisory official's response to a

10

prisoner's complaint is especially thorough. *See, e.g., Johnson v. Wright*, 234 F. Supp. 2d 352,

363 (S.D.N.Y. 2002); *Ramos*, 2001 WL at *9-10 (denial of motion to dismiss where defendant

official responded to plaintiff's concerns with numerous letters). Finally, an inference that a

supervisor was personally involved may be made if the grievance process for a particular type of

inmate complaint demands a certain degree of involvement. *Johnson v. Bendheim*, No. 00 Civ.

720 (JSR), 2001 WL 799569 at *6 (S.D.N.Y. July 31, 2001) (denial of summary judgment

because record unclear about grievance process and degree of involvement by prison Chief

Operation Officer who had denied plaintiff-inmates' grievances).

### 1. Material Facts Are In Dispute As To Whether Defendant Cunningham Was Personally Involved

Lewis alleges that Defendant Cunningham was personally involved in violating his

constitutional rights because Cunningham had five face-to-face conversations with him, received

his letters, negligently supervised the investigation of his grievances, and signed one of his

grievances. Although there is a factual dispute regarding whether Lewis spoke to Cunningham in

person (Cunningham Decl. ¶ 11), these conversations would merely establish Cunningham's

knowledge of Lewis's grievances and therefore would not be sufficient to establish personal

involvement. Nor does Cunningham's mere signature on Lewis's grievance constitute the

lengthy, detailed response that would demonstrate personal involvement. *See Ramos v. Artuz*,

No. 00 Civ. 0149 (LTS) (HBP), 2003 WL 342347 at *9-10 (S.D.N.Y. Feb. 14, 2003).

Finally, Cunningham offers sufficient evidence regarding the investigation into Sgt.

Hopkins's alleged denial of Lewis's permits to demonstrate that there is no triable issue of fact.

Cunningham demonstrates that shortly after Lewis filed his grievance on July 3, 2006, several

employees summarized their findings on the matter, and Cunningham was advised of the

outcome by July 11, 2006. (Cunningham Decl., Ex. A.) Therefore, Cunningham has established

11

that by ordering and directly overseeing an investigation into Lewis's allegations, he was neither deliberately indifferent nor grossly negligent in his supervisory capacity.

Although a prison official may forward a letter regarding medical needs to medical staff, under *Colon*, an administrator may be considered personally involved if he ignores a grievance pertaining to a matter within the scope of his responsibilities. *See, e.g., Lowrance v. Coughlin*, 862 F. Supp. 1090, 1111 (S.D.N.Y. 1994) (plaintiff's letters complaining of numerous, retaliatory transfers demonstrated sufficient personal involvement of Commissioner and Superintendent to survive summary judgment); *Saar v. United States Dept. of Justice*, 705 F. Supp. 999, 1006 (S.D.N.Y. 1989) (material issue of fact regarding personal involvement of Warden who received inmate's complaints of inappropriate administrative segregation). There is a material dispute as to whether Lewis's letters meet this criterion. He sent multiple letters and grievances to Cunningham about conditions he believed should have been prevented by his existent permits: an August 16, 2005 letter regarding housing placement and medical treatment; an October 3, 2005 letter regarding medical trips and transfers; an October 18, 2005 letter regarding the effect of housing on his medical treatment; and a December 10, 2005 letter regarding staff harassment about medical difficulties. (Compl. ¶¶ 69, 79, 91, 99.) The implementation of inmates' permits and overseeing staff compliance with them may be within the authority of a prison superintendent. *Roque v. Armstrong*, 392 F. Supp. 2d 382, 388-89 (D. Conn. 2005) (summary judgment denied on grounds of personal involvement for Captain who allegedly failed to require subordinate staff to honor inmate's special shower permit). Cunningham admits that he reviews all grievances filed by inmates that are not informally resolved. (Pl.'s Mem. at 13 (citing Cunningham Dep. at 16, 19[1]).) Viewing the evidence in the light most favorable to Lewis, reasonable jurors could differ about whether his letters about his

---

[1] The Court notes that this deposition is not found in the record.

non-honored permits were sufficiently detailed and raised an administrative issue that should have demanded a response from Cunningham.[2] Therefore, Cunningham has not met his burden of demonstrating the absence of genuine issues of material fact about whether his repeated failure to respond to Lewis's complaints constituted gross negligence or deliberate indifference. (Lewis Dep. at 143.)

　　2. Defendant Lowery Was Not Personally Involved

　　Lewis contends that Lowery was deliberately indifferent by failing to alleviate Lewis's concerns because he had the "authority and opportunity" to instruct corrections officers to loosen Lewis's handcuffs and waist-chain during medical trips. (Pl.'s Mem. at 15-16.) Lewis concedes, however, that Lowery "retired right after [Lewis] spoke with him." (Def.s' Mem. at 11.) Lewis does not provide any facts that depict Lowery as anything but a link in the "prison chain of command." *Ayers*, 780 F.2d at 210. A vague allegation of "authority and opportunity" is insufficient evidence to establish personal involvement. No reasonable trier of fact could find that Lowery was personally responsible for a deprivation of Lewis's constitutional liberties.

　　3. Defendant Chiavaro Was Not Personally Involved

　　Lewis similarly alleges that Defendant Chiavaro "had the authority to investigate plaintiff's concerns and take steps to alleviate the problems." (Pl.'s Mem. at 16.) Unlike Defendant Cunningham, for whom the evidence creates a material issue of fact regarding the scope of his authority and the appropriateness of his response to Lewis's complaints, Chiavaro did not respond at all. A high ranking official's inaction is, by itself, insufficient to satisfy the requirement of personal involvement, especially when plaintiff's claims involve medical concerns that may be appropriately delegated to medical staff. *See Ramos*, 2001 WL at *7;

---

[2] The Court notes that Lewis claims that Dr. Lancellotti stated that Woodbourne's administration, not Dr. Wright, was responsible for enforcing a flats permit. (Pl.'s Mem. at 14.) There is no supporting documentation in the record for this assertion.

*Joyner*, 195 F. Supp. at 506. Lewis's allegation that medical information was wrongly removed

from his active file might be relevant to demonstrate that prison staff inappropriately failed to

honor his permits. However, Lewis has failed to raise a material issue of fact about Chiavaro's

personal role in the maintenance of his individual medical file. Chiavaro's position as the

supervisor of medical records is similarly insufficient.

      4. Defendant Wright Was Not Personally Involved

      Lewis argues that Defendant Wright is personally involved because of his failure to

implement adequate policies regarding diet, exercise, and living conditions for the general

population of inmates who had suffered heart attacks. (Pl.'s Mem. at 18.) Even if Lewis could

link his alleged deprivation to Wright's inaction, Wright's failure to abide by the particular

American Heart Association recommendations, as Lewis alleges, would not rise to the level of an

unconstitutional deprivation. Lewis also wrote a letter to Wright, but receipt of a letter is

insufficient to create personal responsibility. *Ramos*, 2001 WL at *7. Although Wright's

supervisory responsibilities generally involve medical care, he may rely on front-line medical

staff to respond to individual medical grievances. *Joyner*, 195 F. Supp. 2d at 506. Therefore,

Lewis has failed to establish a material issue of fact regarding Wright's personal involvement.

**C. Eighth Amendment Deliberate Indifference**

      Even assuming that Lewis did establish the personal involvement of each Defendant, they

argue that no material facts are in dispute regarding Lewis's deliberate indifference claim. The

Eighth Amendment, made applicable to the states through the Fourteenth Amendment, *see, e.g.,*

*Rhodes v. Chapman*, 452 U.S. 337, 344-45 (1981), prohibits the infliction of "cruel and unusual

punishment" of individuals convicted of crimes. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 832

(1994).

Inadequate medical care of inmates by prison officials is an example of prohibited cruel and unusual punishment. *Farmer*, 511 U.S. at 832. To demonstrate inadequate medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The plaintiff must prove both the objective prong, that the deprivation of care for his medical condition was "sufficiently serious," *Id.* (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)), *cert. denied*, 513 U.S. 1154 (1995), and the subjective prong, that the defendant "act[ed] with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

> 1. A material question of fact exists regarding whether the deprivation of care for Lewis's medical condition was sufficiently serious.

" 'The objective component of the Eighth Amendment claim is . . . contextual' and fact-specific [and] . . . the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). Thus, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.

With regard to the second element, "a medical condition is considered serious if it is 'a condition of urgency' that may result in 'degeneration' or 'extreme pain,' " *Hernandez v. Keane*, No. 97 Civ. 1267 (BSJ), 2000 WL 16951 at *2 (S.D.N.Y. Jan. 7, 2000) (quoting *Hathaway*, 99 F.3d at 553). This may be either a condition that affects plaintiff's current health problems, or one that is "very likely to cause serious illness and needless suffering" in the ensuing weeks, months, or years. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). "A defendant's act of deliberate indifference may form the basis of an Eighth Amendment claim based on a plaintiff's pain and

suffering, even when the severity of a plaintiff's condition is not necessarily worsened by the act." *Stevens v. Goord*, 535 F. Supp. 2d 373, 384 (S.D.N.Y. 2008). Courts consider factors such as "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (citations omitted).

Here, Defendants concede that Lewis's "heart condition would qualify as a serious medical condition" but argue that Lewis does not establish any deprivation of care because his allegations do not address medical care *per se*. (Def.s' Mem. at 15.) However, improper implementation of permits could be considered medical treatment because the permits were ordered by a physician in response to medical symptoms. Even though Defendants themselves did not make this initial medical decision, their alleged failure to properly honor the permits could objectively constitute a sufficient deprivation of care because, in tandem with Lewis's serious heart condition, it may have resulted in the infliction of unnecessary pain. A reasonable trier of fact could conclude that not having the proper permits in place led to Lewis's prolonged exposure to heat, overexertion, and shortness of breath, particular risks of harm for someone with his heart condition in his circumstances.

Defendants further argue that the pain Lewis complained of did not rise to the level of "extreme pain" for Eighth Amendment purposes. (Def.s' Mem. at 16.) Lewis alleges that during medical trips on May 18, 2005, and June 9, 2005, he experienced difficulty breathing and weakened circulation for several hours. (Compl. ¶¶ 35, 39.) He further alleges that the inappropriate implementation of his housing and flats permits required him to use an excessive number of stairs despite contrary instructions by his treating physicians at Westchester Medical

16

Center. Lewis informed his private physician, Dr. Christiana, of this pain and suffering. (Def.s' Reply Mem. at 6.)

For the purposes of summary judgment, where the court must view the evidence in the light most favorable to the nonmoving party, Defendants are incorrect that Lewis's self-reports are too subjective to be considered valid evidence. (*Id.*) Defendants argue that the "ejection fraction," which measures how much blood Lewis's heart was pumping at various points in time, is a more reliable measure of Lewis's medical condition because it is objective, and that the upward trend in Lewis's ejection fraction measurements indicates a relative improvement. (Def.s' Mem. at 16.) However, Defendants offer no evidence that the ejection fraction negates Lewis's contention that he suffered a serious deprivation of medical care. A test that measures one narrow heart function, removed from the overall context of a patient's medical condition, is not dispositive and is an issue for the jury. For example, a reasonable inference may be drawn that the alleged failure to issue permits to alleviate excessive heat and physical strain caused pain and suffering that were not captured by this medical test.

Defendants have not met their burden of showing the absence of a genuine, material factual dispute as to whether Lewis's medical permits were properly implemented and whether this caused extreme pain and suffering. Thus, a reasonable trier of fact could find a sufficiently serious deprivation of medical care.

### 2. Lewis has not created a material question of fact regarding Defendants' deliberate indifference to his medical care

To establish the subjective prong, a plaintiff must demonstrate that an official acted with a culpable state of mind. This occurs when the official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

17

inference." *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). Negligence, even if it amounts to medical malpractice, does not give rise to liability under the Eighth Amendment. *Id.* at 703. Thus, "the plaintiff must demonstrate that the defendant actually wish[ed] him harm or at least [was] totally unconcerned with his welfare." *LaBounty v. Gomez*, No. 94 Civ. 3360 (DLC), 1997 WL 104959 at *5 (S.D.N.Y. March 10, 1997) (quoting *Hathaway*, 37 F.3d at 69) (internal quotations and citations omitted). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim*, 698 F. Supp. 57, 59 (S.D.N.Y. 1998), *aff'd*, 904 F.2d 33 (2d Cir. 1990).

This deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05. *See also, Tafari v. Stein*, No. 01 Civ. 0841 (HBS), 2009 WL 331378 at *6 (W.D.N.Y. Feb. 11, 2009), *reconsideration denied*, 2009 WL 1322317 (W.D.N.Y. May 08, 2009); 2009 WL 1579530 (W.D.N.Y. Jun. 03, 2009). "Medical decisions will constitute 'indifference' only when they are contrary to accepted medical standards." *Ramos v. Artuz*, 2003 WL  at *7 (citing *Harding v. Kuhlmann*, 588 F. Supp. 1315, 1316 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 990 (2d Cir. 1985)).

Lewis contends that Cunningham, Chiavaro, and Lowery were deliberately indifferent by failing to intervene to shorten his medical trips, loosen his restraints, and honor his medical permits from other facilities. (Pl.'s Mem. at 20-21.) The record contains no evidence about whether prison officials should have known that Lewis would suffer from prolonged exposure to heat and tight shackles because of their failure to honor his medical permits from other facilities. Similarly, there is no evidence that officials intentionally delayed medical care or wished him harm. Furthermore, the only individual who could have made a deliberately indifferent medical

18

decision, Lewis's primary care physician, is not a party. Because Defendants were at most negligent and the evidence does not show that they wished Lewis harm, no reasonable trier of fact could find that Defendants' actions constituted a constitutional violation.

Lewis maintains that prison officials may be held liable if they "reflexively applied DOCS policy." *Johnson v. Wright*, 412 F.3d 398, 400 (2d Cir. 2005). In *Johnson*, however, the defendants acted contrary to "unanimous, express, and repeated – but contrary – recommendations of plaintiff's treating physicians." *Id.* Here the evidence does not support a finding that, at the time of the alleged failure to intervene, Defendants were aware of any active orders by Lewis's treating physician. A mistaken belief that a permit was inactive would not rise to the level of Eighth Amendment deliberate indifference.

### a. Defendant Cunningham was not deliberately indifferent

As noted above, Lewis claims that Cunningham was deliberately indifferent in failing to intervene to shorten his medical trips, loosen his restraints, and honor his medical permits from other facilities. (Pl.'s Mem. at 20-21.) Cunningham's response to Lewis's grievances was sufficient to defeat an allegation of deliberate indifference. The letters about the investigation of Sgt. Hopkins's alleged refusal to honor Lewis's special needs permit (Cunningham Decl., Ex. A), and the investigation into Lewis's housing grievance (Def.s' Mem. at 19), demonstrate that Cunningham appropriately delegated these matters to subordinate staff. Even if the permits should have been active, Cunningham's closing of the investigation because of his mistaken belief that they were inactive, would not rise to the level of an unconstitutional disregard or delay of actual medical treatment. Therefore, the subjective prong of the Eighth Amendment claim fails.

### b. Defendant Lowery was not deliberately indifferent

Lewis contends that Defendant Lowery's failure to intervene on his behalf constituted deliberate indifference. Because Lewis failed to provide evidence of Lowery's dates of employment and retirement, authoritative duties, and direct interactions with him, there is no specific evidence from which the Court could assess Lowery's culpability or his knowledge of a risk to Lewis's health. No reasonable jury could find in favor of Lewis. Therefore, the subjective prong of the Eighth Amendment claim fails.

### c. Defendant Chiavaro was not deliberately indifferent

There are insufficient facts to allow a reasonable jury to conclude that Defendant Chiavaro's delegating Lewis's complaints to Lewis's primary physician amounted to "conscious or callous indifference" to Lewis's medical care. *Zaire*, 698 F. Supp. at 59. Even if the lack of attention to Lewis's needs was negligent, this is not sufficient for a constitutional violation. Therefore, the subjective prong of the Eighth Amendment claim fails.

### d. Defendant Wright was not deliberately indifferent

Finally, Lewis asserts that Defendant Wright manifested deliberate indifference by failing to establish adequate policies for "sufferers of cardiovascular disease" regarding diet, constraints, and strain from stairs and carrying heavy items. (Pl.'s Mem. at 21.) Although Wright agreed that DOCS does not "have a specific system for cardiac patients," he explained that there was a policy to provide individualized responses to inmates' healthcare needs. (Wright Dep. at 6-7.) Alternatively, Lewis argues that Wright was deliberately indifferent to his medical needs by failing to oversee his medical care. A physician who refers an inmate to another physician may be considered deliberately indifferent if he was initially negligent in providing direct medical care, *Hathaway*, 37 F.3d at 67-68 (physician failed to inform a plaintiff of his injuries during

20

numerous medical examinations over a two-year period), or exhibited a total lack of concern

about a severe medical threat. *See, e.g.*, *Liscio*, 718 F. Supp. at 1082 (summary judgment denied

when doctor failed to visit patient with life-threatening and fast-degenerating medical condition).

Here, Wright neither provided medical treatment to Lewis nor was informed of a medical

emergency. Therefore, no reasonable juror could conclude that Wright, the Chief Medical

Officer in Albany, was responsible for supervising Lewis's personal treatment at Woodbourne.

Further, Wright appropriately responded to Lewis's October 2, 2005 grievance by delegating the

investigation of his housing placement and trips permit. Therefore, the subjective prong of the

Eighth Amendment claim fails and Defendants' Motion for Summary Judgment should be

**GRANTED**.

**D. Defendants Are Entitled to Qualified Immunity**

Even if Lewis were to satisfy the personal involvement and Eighth Amendment

standards, Defendants also allege that they have qualified immunity. Unless a state expressly

consents, any claims against a state or a state agency, such as DOCS, are barred by the Eleventh

Amendment. *See, e.g.*, *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100

(1984).  Claims against government officials in their individual capacities, however, are not

expressly prohibited by the Eleventh Amendment. *See, e.g.*, *Mateo v. Fischer*, 682 F.Supp.2d

423, 429 (S.D.N.Y. 2010) (citing *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988)).Qualified

immunity "shields government officials performing discretionary—as distinct from ministerial—

functions from liability." *Kaminsky v. Rosenblum*, 929 F. 2d 922, 925 (2d Cir. 1991). Lewis has

asserted claims against Defendants in their individual capacity.

In order to overcome the qualified immunity defense, a plaintiff must first show that the

conduct of a defendant sued in his individual capacity violated clearly established statutory or

constitutional law of which a reasonable person in defendant's position would have known.

*Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). "The salient question . . . is whether the state of the law gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *United States v. Lanier*, 520 U.S. 259, 270-71 (1997) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances")). The court considers "three factors in determining whether a particular right was clearly established: '(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.'" *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 136 (D.Conn. Mar 30, 2010) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

In the prison context, defendants' actions constitute a violation of clearly established law if the court finds that "the alleged conduct amounts to 'more than ordinary lack of due care for a prisoner's interests or safety.'" *Allah v. Boord*, 405 F. Supp. 2d. 265, 277 (S.D.N.Y. 2005) (quoting *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)). A plaintiff who alleges that prison officials who are not medical doctors had a role in the inmate's medical treatment must provide evidence that the officials "had the authority to intervene in an admittedly medical decision," such that non-intervention would be unreasonable. *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000).

Second, a plaintiff must demonstrate that the named government actor could not have reasonably believed his actions were lawful at the time of the challenged act. *Malsh v. Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995) (citing *Anderson v. Creighton*, 483 U.S. 635, 641

(1987)). For example, a defendant who was deliberately indifferent towards a plaintiff's serious medical needs could not reasonably believe his actions upheld that plaintiff's constitutional rights. *Abdush-Shahid*, 933 F. Supp. at 185; *see also Hernandez*, 2000 WL at *5. Thus, a court's finding of disputed issues of material fact regarding Eighth Amendment deliberate indifference is pertinent to qualified immunity. Also, "if the court determines that the only conclusion a rational jury could reach is that reasonable [officials] would disagree about the legality of the defendant's conduct under the circumstances, summary judgment for the [officials] is appropriate." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). *See also Zellnar v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007).

"The use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh*, 901 F. Supp. at 763 (quoting *Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir. 1992). Summary judgment, however, "is a legal question that sits near the law-fact divide." *Iqbal*, 129 S. Ct. at 1947. Therefore, questions of fact may play a role in the court's qualified immunity inquiry. *See, e.g., Harris v. Coweta County*, No. 01 Civ. 148 (WBH), 2003 WL 25419527 at *6 (N.D. Ga. Sept. 23, 2003), *rev'd on other grounds by Scott v. Harris*, 550 U.S. 372 (2007) ("There are material issues of fact on which the issue of qualified immunity turns which present sufficient disagreement to require submission to a jury."). Judges may "exercise their discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Everitt*, 2010 WL at *11 (citing *Pearson v. Callahan*, 129 S.Ct. 808, 817 (2009)).

Here, Lewis alleges that Defendant Wright violated clearly established law by failing to alleviate Lewis's concerns regarding diet, traversing stairs, carrying heavy items, and long trips while restrained. (Pl.'s Mem. at 23-24.) Wright asserts, however, that his role in this case was not

as a physician, but as an Albany administrator with no direct responsibility for the implementation of Lewis's medical care or permits. Lewis has offered insufficient evidence to establish that Wright had the authority to intervene. Therefore, Lewis has failed to establish that Wright's non-intervention was unreasonable and violated clearly established law.

Lewis's chief allegation against the three Woodbourne Defendants is that they failed to honor his medical permits from Mid-Orange and Sullivan Correctional Facilities. (Pl.'s Mem. at 23.) If this alleged failure to honor permits was a medical decision, there is insufficient evidence to establish that Defendants had authority to intervene, and therefore the actions that they took were reasonable. *See Cuoco*, 222 F.3d at 111. However, framing the failure to honor a transferee's medical permits as an administrative matter, Defendants violated clearly established law requiring prison officials to provide inmates with the medical care ordered by their physicians. *See, e.g., Johnson*, 234 F. Supp. 2d at 367 (motion to dismiss denied because evidence suggested that prison administrators interfered with inmate's medical treatment for reasons unrelated to any medical need). The record is insufficiently developed to determine which framework is appropriate. As result, the Court has insufficient context in which to determine the role of medical permits vis-à-vis Defendants' actions.

Nevertheless, this Court finds that reasonable officials in Defendants' positions could have believed their conduct was lawful. This follows logically for Wright, who did not violate clearly established law. As for the Woodbourne Defendants, the Court's finding that they did not act with deliberate indifference indicates that their conduct was reasonable. While qualified immunity may be denied if prison officials fail to offer patently superior medical treatment, *Ramos*, 2003 WL at *14, here, Lewis's need for particular medical permits was not apparent. Reasonable officers could disagree about whether it was illegal to require new permits to be

issued at Woodbourne before inquiring about existent permits ordered by physicians at other facilities. Therefore, Lewis has failed to defeat Defendants' qualified immunity defense.

## IV. CONCLUSION

In conclusion, I recommend that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Complaint be **DISMISSED** in its entirety.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); FED. R. CIV. P. 72, 6(a), 6(d).

Dated: March 14, 2011
New York, New York

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

**Copies of this Report and Recommendation were sent to:**

Counsel for Plaintiff
Robert N. Isseks
6 North Street
Middletown, NY 10940

Counsel for Plaintiff
Peter A. Sell
324 West 96th Street, Suite 4B
New York, NY 10025

Counsel for Defendants
Rebecca Ann Durden
Assistant Attorney General
120 Broadway - 24th Floor
New York, NY 10271